*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:  January 21, 2016                    106684
_____

THE PEOPLE OF THE STATE OF
    NEW YORK,
                        Respondent,

        v                                      MEMORANDUM AND ORDER

JOSEPH RODRIGUEZ,
                        Appellant.
_____

Calendar Date:   November 19, 2015

Before:   Lahtinen, J.P., McCarthy, Egan Jr., Lynch and
          Devine, JJ.

                        _____


        Paul J. Connolly, Delmar, for appellant.

        D. Holley Carnright, District Attorney, Kingston (Jason P.
Weinstein of counsel), for respondent.

                        _____


McCarthy, J.

        Appeal from a judgment of the County Court of Ulster County
(Williams, J.), rendered February 10, 2014, upon a verdict
convicting defendant of the crime of murder in the second degree.

        After receiving a 911 call from defendant indicating that
his two-year-old niece (hereinafter the victim) was missing,
police arrived at defendant's residence to find his wife holding
the victim's body after it had been discovered in the yard
nearby.  An autopsy performed the following day revealed that the
victim's death was caused by blunt force trauma to her head.
Thereafter, defendant was charged in a sealed indictment with one
count of murder in the second degree.  Following a jury trial,
defendant was convicted as charged and, thereafter, sentenced to

a prison term of 25 years to life. Defendant appeals, and we affirm.

Defendant's challenges to the legal sufficiency of the evidence and the weight of the evidence in regard to the proof as to his identity as the perpetrator is without merit given the overwhelming evidence establishing his guilt. According to the wife's testimony, on the morning in question, defendant assisted the other children in the home in preparing for school and getting on the school bus. According to her, defendant returned to bed thereafter and informed her that the victim was still sleeping. Therefore, at that point, the only three people in the home were defendant, the wife and the victim.

According to the wife, during that same morning, defendant appeared to receive two telephone calls from their neighbor regarding the fact that defendant had previously borrowed power tools from him. These apparent conversations prompted defendant to leave the bedroom on two separate occasions for short periods of time, and defendant indicated, on both occasions, that he was leaving the bedroom to return tools to the neighbor. The neighbor testified that, on the same morning, he did receive a voice mail message on his phone from defendant regarding the tools. However, the neighbor further testified that he was not at his home that morning and that he did not have any conversation with defendant regarding the return of the tools. When the neighbor returned home, he did not find that any of his tools had been returned. The wife further explained that, shortly after she got out of bed, she discovered that the victim was not in her bedroom. After calling 911, they began to search the area outside of the home. The wife testified that defendant then discovered the victim's body nearby on top of a pile of leaves. According to the wife, while she had rushed over, picked up the victim and began to carry her away from that spot, defendant, upon seeing the victim, had fallen to his knees nearby.

Police investigation thereafter uncovered various evidence relevant to establishing the identity of the murderer. Evidence introduced at trial established that the police found defendant's work boots in the master bedroom of the home and that DNA

analysis of a blood spot on those boots revealed that the blood came from the victim.[1]  Further evidence established that a sink in an upstairs bathroom had traces of blood on it and that there were bloody paper towels in a garbage receptacle in that same bathroom.  The washing machine in the home contained a single item of clothing.  That item was a white, damp men's T-shirt that smelled of bleach and had a red stain.  The stain was later determined to be blood, and that stain contained a DNA contribution from the victim.

Despite blood spatter analysis that indicated that the victim had been killed in the yard outside of the home, the police found a blood stain on the sill of a window in a guest bedroom.  An air conditioner had also apparently been removed from the same window, as it was sitting on the floor nearby.  Expert testimony established that this blood was directly applied to the window sill from some source.[2]

In canvassing the bloody leaves at and around the location where the victim's body was discovered, a set of car keys was discovered underneath the leaves.  The wife's testimony established that those keys were the sole set of keys to defendant's and her car and that she had not driven the car in the two prior days.  In a statement to police, defendant indicated that he had driven the car the night before the victim's death.

The foregoing evidence reveals that defendant lied to his wife about his whereabouts on the morning in question and that, shortly after the victim's murder, two items of defendant's

---

[1]  Defendant contends that it is important to note that further evidence was introduced that the victim had suffered a bloody lip two weeks prior to her death.

[2]  Defendant contends that this evidence found in the guest room goes to reasonable doubt as to whether an intruder murdered the victim.  The People contend that the same evidence is merely indicative of the fact that defendant attempted to cover up his crime by staging evidence of an intrusion.

wardrobe were found with blood and the victim's DNA on them.  One of those items appeared to have been recently cleaned with bleach.  Additional evidence found within the house indicated further efforts to clean up blood.  Although defendant had not interacted with the victim's body when it was discovered during his search with his wife, car keys last in defendant's possession were found underneath the bloody leaves surrounding the victim's body.  Considered as a whole, the evidence introduced at trial overwhelmingly establishes that defendant was the perpetrator of the victim's murder (see People v Miles, 15 AD3d 686, 687-688 [2005], lv denied 4 NY3d 855 [2005]).  Accordingly, his arguments that the evidence was legally insufficient and that the verdict was against the weight of the evidence are without merit.

Further, we reject defendant's contention that County Court's denial of his motion for the People to disclose polygraph data from an exam of his wife merits reversal.  To the extent that County Court explicitly agreed with defendant that the question and answer portion of the polygraph was subject to disclosure, this inquiry solely focuses on the physiological data collected during the examination and any interpretations of it. Assuming, without deciding, that a polygraph examination is a "scientific test or experiment" subject to disclosure (CPL 240.20 [1] [c]; see People v Mondon, 129 Misc 2d 13, 15-16 [Sup Ct, NY County 1985]), any error here in denying such disclosure is harmless.  Polygraph results are unquestionably inadmissible (see People v Stevens, 95 AD3d 1451, 1454 n 2 [2012], lv denied 19 NY3d 1029 [2012]; People v Weber, 40 AD3d 1267, 1267 [2007], lv denied 9 NY3d 927 [2007]; see generally People v Angelo, 88 NY2d 217, 222-223 [1996]).  Further, defendant has not offered any explanation for how such inadmissible materials could have assisted him in either preparing for trial or litigation. Accordingly, we perceive no reasonable basis to conclude that the disclosure of such data could have affected the outcome of the trial.

Next, we also reject defendant's argument that his statement to a child protective services (hereinafter CPS) worker should have been suppressed.  Defendant's contention that his right to counsel was violated during such an interview depends on whether the CPS worker was an agent of the police.  "'[S]ocial

workers are generally not agents of the police,' although they may be considered agents under certain circumstances" (People v Whitmore, 12 AD3d 845, 847 [2004], lvs denied 4 NY3d 769, 892 [2005], quoting People v Greene, 306 AD2d 639, 641 [2003], lv denied 100 NY2d 594 [2003]).  Here, although the CPS worker was on a task force that included members of law enforcement, he testified that he did not consult with any law enforcement regarding his plans to interview defendant.  Further, no law enforcement were present at that interview.  Accordingly, where police had no involvement in the CPS worker's initiation or execution of an interview with defendant, the CPS worker did not act as a police agent (see People v Texidor, 71 AD3d 1190, 1191 [2010], lv denied 14 NY3d 893 [2010]; People v Whitmore, 12 AD3d at 847; compare People v Slocum, 133 AD3d 972, 977-978 [2015]; People v Wilhelm, 34 AD3d 40, 46-49 [2006]; People v Greene, 306 AD2d at 640-641).  Accordingly, defendant's right to counsel was not implicated by the interview.

We further conclude that none of the wife's testimony was barred by the marital privilege.  As is relevant to this inquiry, testimony by a spouse with regard to observations and communications that constitute mere "daily and ordinary exchanges" between spouses are not subject to the protections of the marital privilege (People v Melski, 10 NY2d 78, 80 [1961]; see People v Vargas, 60 AD3d 1236, 1239 [2009], lv denied 13 NY3d 750 [2009]).  In any event, a defendant waives any protection afforded by the marital privilege when he or she reveals the substance of otherwise protected communications (see People v Parker, 49 AD3d 974, 978 [2008], lv denied 10 NY3d 868 [2008]; see also People v Jacob, 117 AD3d 1079, 1080 [2014], lv denied 23 NY3d 1063 [2014]).  None of the wife's testimony that related to defendant's actions and statements on the day in question concerned communications that "would not have been made but for the absolute confidence in, and induced by, the marital relationship" (People v Wilson, 64 NY2d 634, 636 [1984] [internal quotation marks and citation omitted]).  Further, defendant essentially repeated the same facts as to those communications in the multiple statements that he thereafter made to third parties (see People v Parker, 49 AD3d at 978).

        Defendant's contentions regarding erroneous evidentiary rulings and improper comments by the People during summation are unpreserved, and we decline to invoke our interest of justice jurisdiction to take corrective action.  To the extent that defendant claims that the failure to preserve such contentions amounted to ineffective assistance of counsel, we disagree. Although the jury could have possibly inferred from the evidence that defendant had spent the evening before the murder working as a pimp, defendant has not shown the absence of strategy of counsel's choice not to draw attention to that bad act evidence by objecting to its introduction; given that there was no explicit evidence that defendant acted as a pimp, an objection could have potentially increased the probability that the jury would make such an inference (see generally People v Benevento, 91 NY2d 708, 712 [1998]).  To the extent that counsel failed to object to certain isolated improper comments during summation, such deficiencies did not rise to the level of denying defendant the effective assistance of counsel (People v Fisher, 89 AD3d 1135, 1139 [2011], lv denied 18 NY3d 883 [2012]; People v Albanese, 38 AD3d 1015, 1019 [2007], lv denied 8 NY3d 981 [2007]).  Defendant's remaining arguments have been examined and are also without merit.

        Lahtinen, J.P., Egan Jr., Lynch and Devine, JJ., concur.


        ORDERED that the judgment is affirmed.




                    ENTER:


                    Robert D. Mayberger
                    Clerk of the Court